JOAN BERNARD ARMSTRONG, Chief Judge.
|,The Board of Commissioners of the Orleans Levee District (OLD) appeals[1] from a trial court judgment of April 9, 2010, determining the annual rental obligation of Landry’s Seafood House-New Orleans, Inc. (Landry’s) to the OLD for property located at 8000 Lakeshore Drive, New Orleans, to be $165,000 for the period from July 1, 2005 to June 30, 2015. The OLD claims that an annual rent of $210,000.00, established properly by a July 2005 appraisal, is the effective rent. Alternatively, the OLD claims that the $200,000.00 annual market rent set by a subsequent appraisal as of July 1, 2005 is the proper rent. Landry’s appeals[2] from the judgment, claiming that the trial court erred in not excusing or reducing its rent for the period from August 28, 2005 through March 31, 2007, a period during which the City of New Orleans and, particularly, the lakefront area where the leased property is located, suffered greatly from the effects of the post-Hurricane Katrina floodwall and levee failures, and during which time the OLD denied Landry’s peaceful possession and use of the property for its intended purpose. The |2OLD argues in brief that “[t]he destruction of the building and Hurricane Katrina’s effects on the local population are not proper grounds for rewriting the Lease.”
On June 28, 1995, the parties entered into a ground lease for OLD property located on the eastern side of the New Basin Canal at Lake Pontchartrain. The lease was for a term of forty years, beginning on July 1, 1995 and ending on June 30, 2035, unless sooner terminated as provided in the lease. Landry’s, as the OLD’s lessee, was to use the leased property for the operation of a restaurant. The rent to be paid by Landry’s to the OLD for the period at issue in this litigation was defined in Article III of the lease as follows:
1. During the period beginning with the commencement hereof through June 30, 2000, Lessee shall pay to Lessor an annual rental of One Hundred Ten Thousand and No/100 ($110,000.00) Dollars. Thereafter, the annual rental shall be adjusted on July 1st each fifth year anniversary as set out below. In the years 2000, 2010 ... annual rent shall be adjusted in accordance with the Consumer Price Index, as provided in sub-paragraph a., below, and in the years 2005, ... annual rent shall be adjusted by reappraisal as provided in subpara-graph b., below.
[[Image here]]
b. For the period July 1, 2005-June 30, 2010, ... the property shall be appraised for the purpose of estimating the fair market rental value and establishing a new annual rental.
The procedures for appraising the property shall be as follows:
Ninety (90) days prior to the effective date for reappraisal, Lessor and Lessee each shall promptly designate an appraiser who shall be a member of the National Association of Independent Fee Appraisers or a similar national or local organization of appraisers of recognized standing, and shall give notice, each to the Isother, of the name and address of the person so designated as such appraiser. The two appraisers so appointed by Lessor and Lessee shall make an appraisal of the estimated fair rental value of the land within the following thirty (30) days. In the event the ap *383 praisers selected and appointed by the Lessor and Lessee are unable to agree upon the estimated fair rental value of the land, the two appraisers shall appoint a third appraiser, who shall be a member of the National Association of Independent Fee Appraisers or a similar national or local organization of appraisers of recognized standing, and the three appraisers shall thereupon proceed to appraise and determine the estimated fair rental value of the land (upon which at least two of the three shall agree) and report the estimated fair rental value of the land. All expenses incidental to such appraisal shall be shared equally by the Lessor and Lessee. In no event shall the monthly rental amount for the renewal period be less than the monthly rental amount paid during the preceding lease period. For purposes of the appraisal, the fair rental value shall be based upon the permitted use of the land and not the highest and best use. Further, the area shown in cross-hatch on Exhibit “B”[3] shall be appraised as support parking only.
2. The annual rent as adjusted shall be paid in advance in equal quarterly installments of one-quarter (1/4) of said annual rental and shall be due and payable, without demand, on the first of July, October, January and April of each year of the lease period, and shall be considered delinquent if not received by the fifth day of said month. [Emphasis supplied.]
Thus, we find that the underlying rationale for the appraisal process is to “estimate the fair market rental value” in order to establish a new annual rental. Furthermore, it is clear from the lease language the appraisal contemplates that, where the two appointed appraisers cannot agree, there will be a third appraisal, conducted by the original appraisers and a third appraiser appointed by them, upon which at least two of the appraisers shall agree in order to impose a new rent.
14Article VIII of the lease provides as follows with respect to fire or other casualty:
In the event of any damage or loss to said premises during the term hereof by reason of fire or other casualty, the Lessee shall give immediate notice thereof to the Lessor. If any building on the leased premises or in the course of construction thereon shall at any time during the term hereof by damaged or destroyed by fire or other casualty, the Lessee shall promptly repair and rebuild the same at the Lessee’s expense so as to make the building at least equal in value to the building existing immediately prior to such occurrence and as nearly similar to it in character as shall be practicable and reasonable. The proceeds of such insurance (other than rent insurance) shall be paid to any person, firm or corporation in the City of New Orleans (the “Trustee”) as may be agreed upon between Lessor, Lessee and any Permitted Leasehold Mortgagee for application as hereinafter provided. The Trustee shall apply and make available and pay to the Lessee the net proceeds or [sic] any fire or other casualty insurance paid to the Trustee for any loss which shall occur during the term hereof, after deducting any costs of collection, including attorney fees, for such repairing or rebuilding as the same progresses, payments to be made against properly certified vouchers of a competent architect in charge of the work and approved by the Lessor. Any excess proceeds remaining after comple *384 tion of the improvements shall be returned to Lessee. Before beginning such repairs or rebuilding or letting any contract in connection therewith, Lessee shall submit for the Lessor’s approval, complete and detailed plans and specifications thereof. Such repairs or rebuilding shall be completed free and clear of mechanics and materialmen’s [sic] liens, or the possibility of such liens.
There shall be no abatement of rent pending the repairs or rebuilding, except to the extent to which the Lessor shall have received the net sum of proceeds of any rent insurance.... [Emphasis supplied.]
| -The parties agree that in early 2005, pursuant to the terms of the lease, the OLD appointed Michael Truax[4], and Landry’s appointed Cushman and Wakefield[5] to perform the property appraisal contemplated by the lease. Cushman and Wake-field appraised the fair annual rental value at $135,000.00, and Mr. Truax suggested an annual rental of $218,800. Since the appraisers did not agree, and, again, pursuant to the lease terms, in June of 2005, the appraisers selected a third appraiser, Bush Benton, to conduct his own appraisal [6]. Mr. Benton did not conduct an independent appraisal, but conferred with the two appointed appraisers and estimated the fair market rental to be $210,000.00. Mr. Benton described his work in a letter dated June 23, 2005[7] to the OLD and to Landry’s Senior Real Estate Manager, John A. Ernst, in which Mr. Benton noted:
... [T]he appraiser has been retained as a third party arbitrator in order to estimate the fair market rental for the subject property....
[T]his appraiser has met with the other appraisers who have conferred and agreed upon a fair market rental applicable to the subject [property] for the period commencing July 1, 2005. As per the lease, the three appraisers have discussed the fair market rental for the property with two of the three appraisers agreeing on a rental. The fair market rental agreed upon is $210,000/an-num or $2.88 PSF [per square foot]....
There is no indication that Mr. Benton performed an independent appraisal or that a third appraisal was performed jointly by the three appraisers as contemplated by the lease. By his own language in his letter, Mr. Benton served as 1 fian arbitrator between Mr. Truax and Mr. Gentry, but did not perform any appraisal function. This characterization is supported by a letter from Mr. Truax to the OLD’s executive director, Max L. Hearn, dated July 11, 2005[8], in which he notes that he “met with Mr. Benton initially to transmit and explain my report and subsequently he, myself [sic] and Mr. Gentry, et al had two *385 extended conferences which ultimately resulted in the rent being ‘set’ at $210,000 per year, I believe a very favorable result for the Levee District.” The OLD contends that this process satisfied the requirements of Article III b of the lease. By a board resolution dated July 20, 2005, the OLD adopted the $210,000.00 annual rental fee and, on July 21, 2005, billed Landry’s at that rate by an invoice dated July 22, 2005. By letter dated July 26, 2005 to Mr. Hearn, Mr. Ernst requested “the supporting data, full appraisal reports and restaurants comparables which can show and demonstrate this 74% increase over the past 60 months.” Mr. Hearn responded, enclosing a copy of the Truax appraisal. Since Mr. Benton had not made an appraisal, there was no Benton appraisal to forward. Mr. Ernst forwarded a copy of the Gentry appraisal to Mr. Hearn. Landry’s objected to the increase in rent, and, the parties admit, timely paid the OLD quarterly rent based on the previous annual rate of $121,000.00.
On August 29, 2005, in the aftermath of Hurricane Katrina, certain levees and floodwalls in the greater New Orleans area failed, including the 17th Street Canal floodwall located approximately fifteen blocks from the leased premises. Louis J. Capo, the director of the OLD’s non-flood assets, including the subject |7property, testified[9] that following the floodwall and levee failures, and until April of 2007, the roadway access to the property from the South and the East[10] was blocked by orders of the civil authorities, and that the blockade was enforced by officers of the OLD. According to Mr. Capo, following April of 2007, and continuing at least to the date of the trial, the OLD prohibited roadway access to the property from the East after dusk and on weekends. The trial court admitted into evidence an article from the Times-Picayune’s nola.com website entitled “Lakeshore Drive Forbidden Zone after Dark”, posted on October 25, 2007. The article quoted Mr. Capo:
You can go out in the morning or the afternoon, but after dark, it’s definitely a safety hazard. Without lighting it’s dangerous.
The article then noted that Mr. Capo said the OLD had not decided whether it could afford the electricity in 2008 to keep the lights on, whenever they might be repaired. Furthermore, “More than one visitor has complained that barricades sometimes go up well before dusk — or that Levee District police sometimes have been brusque to the point of rudeness.” The article concludes with Mr. Capo’s statement that it will be “almost another year of no nighttime access to much of the lakeshore.”
On October 20, 2005, by letter from the OLD’s counsel, Gerard G. Metzger, to Landry’s general counsel, the OLD, after having expressed “its sympathy to, and best wishes with [sic], Landry’s, as well as all other New Orleans businesses that | shave been so affected by Hurricane Katrina,” advised Landry’s that it should advise the OLD when it expected to reopen and of the nature, extent and source of damage to the property. The OLD also reminded Landry’s of its obligation to rebuild or repair, and of the OLD’s right to advance approval of any rebuilding, removal or demolition on the property. The OLD sought the names of any architect, engineer, or other professional who had *386 inspected the premises or been retained in connection with their repair. OLD also demanded information concerning the status of Landry’s insurance claims, and reminded the lessee of the lease’s escrow provisions. In the letter’s penultimate paragraph, the OLD stated:
Finally, please accept this letter as formal notice ... that Landry’s is currently in violation of its rent obligation under the Lease for its failure to pay the full amount of the quarterly rental payments due as of July 1, 2005, and October 1, 2005.
On November 29, 2005, Mr. Metzger’s office forwarded to Edward Engel, Landry’s associate counsel, a copy of the OLD’s petition to accelerate rent in which the OLD sought judgment against Landry’s for $6,239,500.00 plus legal interest from judicial demand, reasonable attorneys’ fees, an “administration fee” of ten percent of the average monthly rental and court costs. That litigation bears number 05-12898(F) on the docket of the Civil District Court for the Parish of Orleans. By letter dated December 7, 2005, Landry’s staff counsel advised Mr. Metzger that it had paid the rent due for October, November and December 2005 and sought dissolution of the lease or diminution in the rent because of conditions at the premises [11] following the floodwall and levee failures. Counsel requested the opportunity to make a formal presentation to the OLD board for a modification of |3the lease, withdrawal of all purported defaults, and dismissal of the pending litigation. Mr. Metzger replied, advising Landry’s that it would not refer the matter to the OLD board until Landry’s explained its action in stopping payment on its check for the adjusted rental for the third quarter of 2005. Landry’s ultimately paid the additional rent under protest, reserving its right to contest the amount of rent due under the lease. By order dated February 13, 2006, the trial court granted the OLD’s voluntary motion to dismiss its suit in No. 05-12898 without prejudice.
By letter dated January 27, 2006, Mr. Engel advised Mr. Metzger that Landry’s would be pleased to make a formal presentation to the OLD’s Planning, Engineering and Construction Committee scheduled for January 31, 2006. Mr. Engel outlined the following proposal on behalf of Landry’s: Landry’s would continue paying rent at the current rate during reconstruction. Upon opening the restaurant, in light of the uncertainties as to the population and resumption of recreational use of Lake Pontchartrain, Landry’s would pay percentage rent of two percent of the first $2,000,000 in revenues, four percent on the next $1,000,000 in revenues, and six percent on the next $2,000,000 in revenues. No percentage rent would be paid on revenues in excess of $5,000,000. Within twenty-four months of the re-opening of the restaurant, in the event that revenues over any twelve consecutive months did not exceed $2,400,000, Landry’s would have the right, within one hundred twenty days following that period, to suspend restaurant operations for up to twenty-four months, at the end of which time, Landry’s would either reopen the restaurant or return the property to the OLD, terminating the lease. This right to suspend operation would continue for ten years.
On February 27, 2006, Mr. Engel sent a facsimile memorandum to the OLD, attention to Mr. Capo, noting that it had not *387 been possible to reach the OLD at the L (¡telephone number listed on its website, and requesting that the rent structure issues between the OLD and Landry’s be placed on the agenda for the April 4, 2006 meeting of the OLD’s Planning, Engineering and Construction Committee, and on the agenda for the April 19, 2006 OLD board meeting. Landry’s presentation to the committee was admitted into evidence by the trial court. It provides graphic and dramatic evidence of the devastation caused by the floodwall and levee failures to the building’s structure, the need to rebuild or replace the building’s plumbing, electrical, fire sprinkler, elevator, drink lines, dumpster storage area, walls on lower left side of building, lattice and wainscoting, gutters, downspouts, awning, insulation, gooseneck lights, soffit and fascia, metal hand rails, fence rails, metal roofing panels, signage, roof over deck, exterior fans, hardwood floors and air-conditioning system. A HazMat crew would be needed to clean out the restaurant’s coolers. Landry’s presented the budget to clean the premises and make non-structural repairs. The “preliminary rough estimate” of these costs was $1,353,375.00. The timetable, assuming a full structural assessment revealed no structural damage to the building, was thirty days for site clean-up and demolition and one hundred twenty days for construction, for a total of one hundred fifty days. Landry’s also presented demographic information from Smart Reporting showing that for American Express cardholder patrons of the restaurant, over fifty-six percent of sales took place from Friday through Sunday. Local cardholders accounted for 59.4 percent of sales and Lafayette and Lake Charles Louisiana cardholders accounted for 1.49 percent of sales.
On July 29, 2006, Landry’s filed suit against the OLD seeking a declaratory judgment declaring:
|¶¶(1) Without Landry’s fault, the leased premises were destroyed and/or substantially impaired;
(2) Landry’s either owes no rent under the Lease or is entitled to a reduction of the annual rent;
(3) Landry’s is entitled to a refund from OLD of all or part of the rent that Landry’s has paid since August 29, 2005, or a credit toward Landry’s future payments;
(4) OLD improperly induced Landry’s into leasing the premises and making capital improvements thereto.
Landry’s also prayed for all legal and equitable relief that the facts and circumstances would warrant.
By letter dated August 8, 2006, mailed and sent by facsimile to the OLD’s interim counsel, Landry’s trial counsel sent a copy of its engineering firm’s field report. The report noted seven structural anomalies, identified by the engineer as relatively minor and easily repaired. By letter dated August 8, 2006, the OLD’s interim counsel asked for insurance proceeds, estimates, and proofs of claim filed.
The trial court admitted into evidence a market study dated October 18, 2006, conducted by Henry W. Tatje, III, MAI, reviewing the lease for the purpose of determining whether or not any change was warranted in the then current level of lease rental payments, based on recent changes in local market conditions. Mr. Tatje noted the following regional trends:
Prior to Hurricane Katrina in August 2005, New Orleans and its surrounding suburbs comprised a major metropolitan area with a total population of 1.4 million (Source: Louisiana Tech University, July 1, 2005, intercensal estimate). According to estimates prepared by Dr. Wade Ragas of Real Property Associates, Inc., which are based on informa *388 tion from the U.S. Post 112Office, school enrollment surveys, Entergy utility hookups and the C.D.C., the population of the metropolitan area was estimated after Hurricane Katrina to be 1,096,000, or 22.2% lower than the pre-storm figure. The parishes of Orleans, Plaque-mines, St. Bernard and Jefferson showed post storm declines of -56%, - 40%, -89%, and -6%, respectively, while St. Charles, St. John, St. Tammany and Tangipahoa saw population increases of 1.7%, 5.4%, 10% and 4.2%, respectively. This shift in population patterns reflects gravitation toward the relatively undamaged areas of the metropolitan area.
The study also noted a substantial decline in tourism trade, largely attributed to damage to the Convention Center and the closure of three major hotels, the Hyatt, Ritz-Carlton, and Fairmont, and opined that it appeared that the industry will still be relatively slow for the remainder of 2006, 2007 and possibly into 2008. It noted the loss of 206,000 jobs after the flood-wall and levee failures, and the recovery of approximately 86,000 of those jobs as of June of 2006. The study also focused on the “devastated” healthcare sector, noting that that sector “could take years to rebuild.” The economic study concluded that the recovery process was expected to take at least eight to ten years, depending on the willingness of residents to return and rebuild, and the willingness of the federal government to provide rebuilding funds to economic sectors and residents. The study then focused on conditions in the immediate vicinity of the leased premises:
The subject property is located in the northwestern most corner of the city of New Orleans in an area known as “West End”. This is an area of waterfront development on the south shore of Lake Pontchartrain which includes two publicly owned and operated marinas, several up scale [sic] condominium developments, boat houses, and a number of restaurants and lounges. To the east and south, prior to Katrina, was a vibrant and steadily improving middle to upper income, densely developed inner city neighborhood generally known as “Lakeview”. It was [about] 97% built up with home prices generally ranging from $250,000.00 to over 11S$1,000,000.00. Condominiums in the immediate subject neighborhood ranged from $200,000.00 to $1,000,000.00. Boat houses on leased land were selling for $150,000.00 to over $500,000.00 and both marinas had full occupancy with waiting lists. These factors all changed on August 28, 2005, when Hurricane Katrina hit southeast Louisiana and the city of New Orleans.
The subject’s immediate neighborhood and most of “Lakeview” were devastated by flooding from hurricane Katrina. The Southern Yacht Club, a fixture in the marina area, flooded and burned. Virtually every boat house flooded. Boats were tossed about in the marina, with many sinking, and/or ending up on dry land and most were damaged. Virtually every business in the neighborhood flooded. Some had them buildings totally washed away, and few have returned as of current date. 90% of homes in Lakeview received severe flooding and as of current date [October 18, 2006] no more than 10% have been repaired and/or reoccupied.
The marinas remain littered with sunken and damaged boats. Few boat houses have been repaired, and few businesses have returned to the area. This includes several areas of retail and office uses just east and south of the subject’s immediate location. The amount of auto and foot traffic in the area is drastically below pre storm levels, and with the slow pace of the recov *389 ery expected to continue. These trends will improve very gradually into the near future (1-3 years).
The study mentioned the fact that of the eleven other restaurants in the area, only two had reopened for business, and only one of the closed restaurants had been repaired. The repaired restaurant had been offered for lease at reduced rental rates for six months. Mr. Tatje concluded, “There is clearly, a drop off in demand for restaurants in the immediate subject market area.” Because of this lack of market rental data in the area, Mr. Tatje interviewed several of the more active agents and brokers in the French Quarter, an area that was among the least affected by the floodwall and levee failures, and which did not experience widespread, devastating flooding, and a local banker active in the market, and compiled a chart |14showing five restaurants that had reopened in the French Quarter, one of which paid forty-one percent less in rent and four of which paid fifty percent less in rent than prior to the floodwall and levee failures. Of five retail establishments, four were paying rent reduced by fifty percent, and one was paying based on a percentage of sales. Of five French Quarter restaurants surveyed, one was out of business, one was closed, two were achieving only about twenty-five percent of their pre-floodwall and levee failure sales, and one was achieving only about twenty percent. The French Market Corporation and Upper Pontalba Building Restoration Corporation reported that rental concessions were made to all retail tenants, including free rent for the fourth quarter of 2005 and a fifty percent reduction for 2006, subject to reevaluation in 2007. Residents received free rent for fourth quarter 2005, fifty percent reduction from January to April of 2006, and a sixty percent reduction from April to December of 2006, with a planned reevaluation in 2007. The study concluded:
Based upon the data and information contained herein, and in light of the current depressed market conditions present for the subject property type and location, my conclusions as to a reasonable and warranted reduction or adjustment to the current level of rent due under the lease for the subject property, as a result of the negative effects of Hurricane Katrina are as follows:
Last Quarter of 2005: Free Rent
All of 2006: 50% of pre Katrina rent
2007 and Beyond: 50% of pre Katrina rent, against a percentage of gross sales, as compared to pre Katrina gross sale levels, with gradual future increases as market conditions return to more normal levels
\vjThe previous conclusions assume that the subject property would have had all municipal services (water, sewerage, electricity, telephone, and gas) available from January 1, 2006 to present. If this were not the case, even greater discounts in rent and/or additional months of forgiven rent would be warranted, as the tenant would not have been able to operate a business or obtain an occupancy permit from the city, assuming all repairs had been made, and an attempt was made to re-open during this time frame. [Emphasis in original.]
Landry’s made a formal proposal for rental adjustments based on the Tatje report, submitting the proposal to Jerry Le-Blanc of the State of Louisiana’s Division of Administration.
The OLD answered Landry’s petition, filing dilatory exceptions and asserting affirmative defenses including, inter alia, discretionary immunity under La. R.S. 9:2798.1; emergency acts preparedness *390 immunity under La. R.S. 29:735; failure to mitígate damages; and contribution/offset relative to applicable insurance on the leased premises. On July 16, 2007, Landry’s moved for a status/scheduling settlement conference in order to bring the litigation to a conclusion, which the trial court granted. Ultimately, trial was held on March 17, 2008, resulting in a trial court judgment dated April 17, 2008. The trial court ordered that the parties select a mutually agreed upon appraiser to fix an annual rent pursuant to the terms of the lease, providing that if the parties could not agree on an appraiser, the trial court would do so. The trial court fixed an interim annual rent of $110,000.00, retroactive to July 1, 2005, until such time as the appraiser establishes a fair market rental. In the event that the fair market annual rental is less than $210,000.00, Landry’s would be entitled to a credit on past and/or future rents from July 1, 2005.
On April 28, 2008, the OLD filed a motion for new trial. On May 20, 2008, the trial court rendered judgment denying the OLD’s motion and amending the | lr,interim annual rent provided for in its original judgment, upon the joint stipulation of the OLD and Landry’s, from $110,000.00 to $121,000.00, retroactive to July 1, 2005. Neither party appealed from the original judgment or from the amended judgment either by direct appeal or by an application for supervisory writ. The April 2008 judgment was quite clear that a new appraiser should be appointed. Any doubt concerning the meaning of the judgment was resolved by the trial court’s Reasons for Judgment, in which the trial judge noted:
Mr. Cantwell [Landry’s Senior Vice President of Development] testified he nor anyone else at Landry’s had any role in the selection of Mr. Benton as a third appraiser. Mr. Cantwell also testified and correspondence establishes that Landry’s did not agree to an annual rent of $210,000.00.
Mr. Cantwell added that Bush Benton did not perform an independent appraisal of the property. In fact, Mr. Benton’s letter dated June 23, 2005 to Landry’s and O.L.D. refers to his role as a “third party arbitrator”. (Plaintiffs Exhibit 8) Although his letter states the appraisers “conferred and agreed upon a fair market rental applicable to the subject period commencing July 1, 2005”, Mike Gentry’s signature is missing on behalf of Cushman & Wakefield as appraiser for Landry. Mr. Cantwell further testified in October or November 2005 following Hurricane Katrina, he attempted to contact Gerard Metzger, attorney for O.L.D., concerning the appraisal process and rent increase.
Considering the uncontroverted evidence presented by plaintiff, the Court concludes that the appraisal process was never concluded and a fair market rent for July 1, 2005 was not established pursuant to Article III l.b. of the Lease Agreement between the parties.
The appraisal procedures in the lease agreement create a suspensive condition that must be fulfilled as written before an obligation to pay rent is established. The concept of a suspensive condition involves the occurrence of an event or circumstance beyond the control of the contracting party. Champagne v. Travelers Ins. Co., 276 So.2d 914 (La.App. 4 Cir.) The right to enforce an obligation does not arise until the fulfillment 117of the suspensive condition, and the obligation may not be enforced until the condition is met. Murry v. Murphy, 970 So.2d 700 (La.App. 3 Cir.2007). Thus, the Court finds there is no obligation under the lease for plaintiff to *391 pay defendant annual rent in the amount of $210,000.00.
That judgment not having been appealed by direct appeal or by application for supervisory writ, it is the law of the case. The law of the case doctrine refers to (a) the binding force of trial court rulings during later stages of the trial; (b) the conclusive effects of appellate court rulings at the trial on remand, and (c) the rule that an appellate court ordinarily will not reconsider its own rulings of law at a subsequent appeal in the same case. This doctrine may bar redetermination of a question of law or a mixed question of law and fact during the course of a judicial proceeding. Scott v. American Tobacco Company, Inc., 09-0461, p. 4 (La.App. 4 Cir. 4/23/10), 36 So.3d 1046, 1050; writs denied, 10-1358 (La.9/3/10), 44 So.3d 686; 10-1361 (La.9/3/10), 44 So.3d 707; stay granted sub nom Philip Morris USA Inc. v. Scott, — U.S. -, 131 S.Ct. 1, 177 L.Ed.2d 1040 (2010); 1 Frank L. Maraist and Harry T. Lemmon, Louisiana Civil Law Treatise: Civil Procedure, § 6.7 (1999). The policy reasons behind this doctrine include avoidance of re-litigation of an issue, consistency of result in the same litigation, and promotion of efficiency and fairness to the parties by affording a single opportunity for the argument and decision of the matter at issue. Day v. Campbell-Grosjean Roofing & Sheet Metal Corp., 260 La. 325, 330, 256 So.2d 105, 107 (1971). The doctrine is inapplicable in cases of palpable error or where manifest injustice would occur. Keaty v. Raspanti, 96-2839, p. 4 (La.App. 4 Cir. 5/28/97), 695 So.2d 1085, 1087. In the case at bar, we have been directed to and find no basis for a finding that application of the principle would result in manifest injustice to either party. Neither do we |1Rfind the trial court’s analysis of the lease agreement as set forth in the 2008 judgment and the court’s reasons for judgment to be “palpably erroneous”. In response to the trial court’s judgment, OLD chose to proceed to follow the judgment’s direction in joining with Landry’s to choose an appraiser, Bradley D. Bird, to, as the 2008 judgment provided, “fix an annual rent pursuant to the terms of the Lease Agreement between the parties for the property located at 8000 Lakeshore Drive, retroactive to July 1, 2005.” For purposes of this appeal, that judgment is the law of the case and will not be disturbed.
Having accepted the effect of the trial court’s judgment that an appraiser be appointed, on or about February 17, 2009, the OLD filed a motion to set a status conference or hearing. In its motion, OLD contended that it had proposed Jean Felts as the final appraiser in or about July of 2008, and that Landry’s did not agree to her use or propose an alternative appraiser. OLD sought a status conference or hearing “in order to select a third appraiser and enable the parties to conclude this matter in accordance with this Court’s judgment.” On March 31, 2009, Landry’s filed a similar motion, noting that while the parties had agreed upon Mr. Bird to conduct the appraisal, there was an apparent difference between the parties concerning the role of the new appraiser. Ultimately, Mr. Bird appraised the leasehold, as of effective dates July 1, 2005 and December 28, 2009.
On March 2, 2010, upon the joint motion of the OLD and Landry’s, the trial court ordered a hearing to determine the rental rate for the leased premises. Following the hearing, at which the Bird appraisal was admitted into evidence, but no testimony was taken, the trial court entered its judgment. The trial court noted that it had considered its original 2008 judgment, the memoranda and argument of counsel, the lease agreement, and the Bird summary appraisal report dated January 11fl25, *392 2010, and arrived at an annual rent of $165,000, for the period from July 1, 2005 to June 30, 2015.
Mr. Bird noted in his appraisal that the purpose of the appraisal was to estimate the market rent for restaurant use, as though the site wei*e bulkheaded, but assuming the existing restaurant development does not exist (i.e. that the land is vacant) as of the specified dates: July 1, 2005 and December 28, 2009. The appraisal defines market rent as the rental income that a property probably would command in the open market, indicated by currents rents either paid or asked for comparable space as of the date of the appraisal. Mr. Bird researched available databases including Realtors, MLS, and courthouse record research, and reviewed the lease agreement, the reports prepared by the two previous appraisers, and Mr. Benton’s letter. Mr. Bird researched, formulated, and wrote his appraisal report between July 2, 2009 and January 25, 2010. After having noted conditions similar to those mentioned in the Truax and Cush-man appraisals, Mr. Bird concluded that as of July 2005, “the subject [property] was a highly desirable and viable restaurant site that would readily attract local and national operators alike.” He reviewed comparable pre-Katrina land sales and concluded that, at that time, the property had a fee simple market value of $32.50 per square foot for restaurant use, or a total site value of $2,370,000. Mr. Bird noted that while throughout most of the 1990s, a majority of local land leases were based on a ten percent net return, capitalization rates for all property types started to decline in the late 1990s, because of falling alternative investment rates and the increased volatility of the United States stock market. After having considered comparable capitalization rates, Mr. Bird concluded that a land capitalization rate of eight and a half percent [gnis best supported, resulting in an annual triple net[12] rent, based on capitalization, of $201,500.00.
Mr. Bird then conducted an analysis of market rent based on the OLD’s other comparable sites leased in the immediate market area.[13] Those leases ran from $1.59 per square foot to $3.00 per square foot. The restaurant leases showed rent of $1.66, $1.59, and $2.14 per square foot; however, the appraiser opined that the restaurant figures were not sufficiently current to be useful. Based on a comparable lease analysis, Mr. Bird set pre-Katri-na rent between $2.50 and $2.75 per square foot, resulting in an annual triple net rent of $190,000. Because of the limitations noted in the available comparable lease data, Mr. Bird concluded that the capitalization approach was more reliable and set the market rent as of July 1, 2005 (pre-Katrina) at $200,000.00, or $2.74 per square foot.
Mr. Bird reviewed Landry’s gross sales history, concluding that its annualized 2009 gross sales were about 13.4 percent lower than they were in 2004. Prior to the floodwall and levee failures, Landry’s operated the restaurant as “Joe’s Crab Shack”, and reopened in 2007 as Landry’s Seafood Restaurant. Landry’s advised Mr. Bird that Landry’s average customer ticket historically was about twenty per *393 cent higher than the Crab Shack’s average ticket. Between 2002 and 2004, prior to the floodwall and levee failures, gross annual sales fell by nearly seven percent, a fact the appraiser attributed to the “considerable disadvantage” a national seafood chain store realizes because of the “extraordinary loyalty residents have for their favorite local establishments.” Mr. Bird described the updated ^market information as “somewhat mixed”. Most new restaurant activity had been largely confined to major corridors such as Veterans Boulevard in Metairie and Clearview Parkway in Elmwood. He also found “noteworthy” the fact that the former Bennigan’s Restaurant on Veterans Boulevard remained vacant, with an asking annual net lease rate of $331,000.00. He noted and enlarged upon the devastation caused by the 2005 floodwall and levee failures that had been described in the two prior appraisals, and updated that information with data concerning the area’s recovery over the four years since those floodwall and levee failures.
He concluded:
The market evidence overwhelmingly points to a decline in restaurant sales in the West End/Lakeview market area. This is shown not only from competing businesses, but from the subject property itself. Having only one-half of Lake-view’s pre-Katrina population certainly impacts the viability of the subject site from a restaurant development perspective. Also relevant is that restaurant operating expenses throughout the area have risen considerably since the storm, particularly insurance and labor costs. Several nearby restaurant rental rates were found to be reduced since the storm. Furthermore, the subject’s relatively large size makes any new development at this time a challenge. The economic downturn has generally resulted in scaled down projects.
Notwithstanding the preceding, there are no other available sites in the West End area that offer comparable views of the lake. Those locations within West End Park where [other restaurants] once stood, will likely remain vacant into the foreseeable future... .And while market conditions may not be ideal at this time, the opportunity to secure a unique site such as the subject would still likely generate a considerable amount of interested restaurant operators, knowing that Lakeview is steadily recovering and that business cycles are a natural phenomenon.
| a2Mr. Bird concluded that a fifteen to twenty percent reduction from the pre-floodwall and levee failure rent is indicated as of July 1, 2005. He noted, “This implies that the property’s current market rent ranges from approximately $160,000.00 to $170,000.00.” He reconciled the triple net market rent as of December 28, 2009 to be $165,000.00.
In Louisiana, trial court judgments are reviewed for errors of fact and of law. La. Const. Art. V, § 10B. The district court’s findings of fact are reviewed under the manifest error standard. Before the reviewing court may reverse a factual finding, it must find from the record that a reasonable factual basis for the finding does not exist and that the record, taken as a whole, establishes that the finding is clearly wrong. Thus, where there is more than one permissible view of the evidence, the fact finder’s choice among them cannot be manifestly erroneous or clearly wrong. Ultimately, the issue to be resolved on appeal is not whether the trier of fact was right or wrong, but whether its conclusions were reasonable. S.J. v. Lafayette Parish School Bd., 09-2195, p. 6 (La.7/6/10), 41 So.3d 1119, 1127. While it is well-settled that reviewing courts will defer to a trial *394 court’s reasonable decision on a question properly within its discretion, it is self-evident that, if the decision was based on an erroneous interpretation or application of law rather than a valid exercise of discretion, such an incorrect decision is not entitled to deference. Kem Search, Inc. v. Sheffield, 434 So.2d 1067, 1071-72 (1983).
The fact that the OLD prepared the lease agreement requires that any ambiguous or doubtful provision in the lease is to be interpreted in favor of Landry’s and against the OLD. La. Civ.Code art. 2056. Landry’s argues in brief that it receives a similar favorable interpretation as the obli-gor under the lease | ^agreement, pursuant to La. Civ.Code art. 2057. However, the contract of lease is a synallagmatic contract by which the parties bind themselves reciprocally, so that the obligation of each party is correlative to the obligation of the other. See, La. Civ.Code arts. 1908 and 2668, and Revision Comment (b) of 2004 to La. Civ.Code art. 2668. Chittenden v. State Farm Mutual Auto. Ins. Co., 03-681 (La.App. 4 Cir. 4/21/04), 872 So.2d 580, cited by Landry’s in support of application of La. Civ.Code art. 2057’s favorable interpretation did not involve a lease or other synallagmatic contract and is inapposite to the instant case.
The OLD assigns three errors: (1) The trial court erred in finding that the appraisal conducted in 2005 was not properly completed and ordering the property to be reappraised; (2) the trial court erred in assessing the rental rate as of the date of the reappraisal in 2009 rather than as of the July 2005 date required under the lease; and (3) the judgment should be clarified to note that the valuation applies only from July 1, 2005 to June 30, 2010, at which time the Consumer Price Index adjustment provided for in Article III(l)(a) of the lease should be implemented.
Because of the application of the law of the case doctrine, as discussed above, the first assignment of error is without merit.[14]
The OLD, in its second assignment of error, essentially contends that the trial court’s judgment fixing the rent at $165,000 as of July 2005 is contrary to the lease agreement, which has the force of law between the parties. It is the OLD’s 1 ¡^position that Mr. Bird’s finding that the appropriate rent as of July 1, 2005, $200,000.00, establishes the rent for the entire period until the next appraisal set by the lease agreement[15]. Landry’s takes the position that the December 2009 valuation is appropriate, but that the trial court’s judgment should be modified to reflect the effects of not only the devastation caused by the levee and floodwall failures but also the closure of access to the premises from August of 2005 to April 1, 2007.
*395 It is clear from the lease itself that, as the OLD argues, certain risks were to be borne by Landry’s. Applying the manifest error standard of review, we find that the trial court’s conclusion accepting Mr. Bird’s summary appraisal report imposing an annual rental of $165,000.00 for the period from July 1, 2005 to June 30, 2015 for the subject property is supported by the record, taken as a whole. While other reasonable fact finders could have found support in the record for Landry’s contention that it is due a further and additional abatement and/or reduction of rent because of the unexpected and sui generis results of the levee and floodwall failures of 2005, we cannot say that the trial court’s implicit rejection of that contention is unreasonable, manifestly erroneous, or clearly wrong.
We find nothing in the trial court’s judgment that would prohibit application of the terms of Article III(l)(a) of the lease agreement. There being no evidence that the said provision will not be applied, the OLD’s third assignment of error is moot.
| asFor the foregoing reasons, we affirm the trial court’s judgment setting the annual rent from July 1, 2005 to June 30, 2015 for the subject property at $165,000.00.
AFFIRMED.
GORBATY, J., dissents in part, with reasons.
BELSOME, J., concurs in the result.

. The OLD filed its petition for devolutive appeal in the trial court on May 26, 2010.

. Landry’s filed its petition for devolutive appeal in die trial court on June 2, 2010.

. Exhibit B to the Lease is not part of the appellate record.

. The record contains a copy of the OLD's board resolution dated February 16, 2005, appointing Mr. Truax. It advised Landry's general counsel of the selection by letter dated February 21, 2005. Mr. Truax’s appraisal as of May 2, 2005 was admitted into evidence by the trial court.

. Cushman and Wakefield’s report, as of April 15, 2005 and prepared by its Senior Appraiser, Michael E. Gentry, was admitted into evidence by the trial court.

. The OLD approved the selection of Mr. Benton by board resolution adopted on May 18, 2005. A certified copy of the resolution was admitted into evidence by the trial court.

. The record contains two copies of the letter of June 23, 2005; one is signed only by Messrs. Benton and Truax; the second copy is signed by Messrs. Benton, Truax, and Gentry.

. In that letter, Mr. Truax requested additional compensation for his additional work with Mr. Benton. That request was approved to the extent of $750 by an OLD board resolution dated August 17, 2005.

. Mr. Capo's testimony was taken on March 17, 2008, in connection with the original hearing on the merits, that resulted in un-appealed judgments rendered in 2008.

. Because of the property’s location where the New Basin Canal meets Lake Pontchartrain, there is no North or West access to the property.

. At the time of writing, the letter indicated that the zip code in which the premises were located had no operational traffic signals, no bus service, no gas stations, only twenty-eight percent of electric service and only thirty-five percent of gas service had been restored, and the area was under an 8 p.m. to 6 a.m. curfew.

. Triple net leases, like the lease at issue in this litigation, require that the lessee is responsible for payment of taxes, insurance and maintenance expenses associated with the premises.

. These sites included property leased to Tom Benson (private dock), J & J Partners (condominium), Six by the Sea, LLC (condominium), Hong Kong Enterprises (restaurant), Pontchartrain Enterprises (restaurant), and Lighthouse Harbor (condominium project).

. We note that even were the law of the case doctrine inapplicable under the facts of this case, application of the manifest error rule to the reasonable factual findings of the trial court would achieve the same result. The evidence of record, taken as a whole, supports the trial court’s factual finding that the appraisal process for the period from July 1, 2005 to June 30, 2015 was not completed prior to the 2008 trial. Furthermore, the trial court's factual finding that Mr. Benton did not conduct an appraisal, as required by the lease, is reasonable and not manifestly erroneous or clearly wrong.

. The OLD observes correctly, as did the trial court in its reasons for judgment, that La. Civ.Code art. 2676 has no application under the facts of this case. That article provides that there is no lease where the method of establishing rent "proves unworkable or the designated third person is unwilling or unable to fix the lease." In the present case, the parties agreed that Mr. Bird would provide the third appraisal contemplated by the lease agreement.